IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PHILIP CAPPS, | § | |
| | § | |
|     *Plaintiff*, | § |                1:19-CV-990 |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | § § | |
| | § | |
|     *Defendant*. | § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

---

Plaintiff, Philip Capps, complains of Defendant, International Business Machines Corporation (IBM), under the Age Discrimination in Employment Act (ADEA)[1] and Texas Labor Code Chapter 21 as follows:

**I.**

**Parties**

1. Plaintiff, Philip Capps, is an individual residing in the Western District of Texas. He was born in 1967.

2. Defendant, International Business Machines Corporation, is a New York corporation with its principal office at 1 New Orchard Road, Armonk, New

---

[1] 29 U.S.C. §§ 621-634 (2000).

**Plaintiff's Original Complaint and Jury Demand – Page 1**

York 10504-1722. IBM does business in the Western District of Texas and maintains an office at 11501 Burnet Road, Austin, Travis County, Texas 78758. It may be served with citation by serving its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

## II.

## Jurisdiction and Venue

3. This Court has jurisdiction over Mr. Capps's claims under 28 U.S.C. § 1331, and 29 U.S.C. § 626.

4. A substantial portion of the acts and omissions giving rise to Mr. Capps's claims occurred at IBM's location in Travis County. Venue is proper in this district and division under 28 U.S.C. § 1391(b) and (c).

## III.

## Exhaustion of Administrative Remedies

5. Mr. Capps timely dual-filed his Charge of Discrimination with the Equal Employment Opportunity Commission and Texas Workforce Commission on June 19, 2019. On July 15, 2019, the Equal Employment Opportunity Commission issued a Right to Sue to Mr. Capps.

## IV.

## IBM's Systemic Age Discrimination Problem

6. This case involves IBM's age discrimination against Mr. Capps, and, make no mistake, IBM has a significant age discrimination problem. For the last several years, under CEO Ginni Rometty's tenure, it has expended considerable resources deliberately pivoting towards a more youthful brand identify and workforce focused on "millennials" and the potential "billions" of dollars in sales that IBM determined "millennials" represented.

7. IBM, however, had more than an infatuation with "millennials;" it seemed obsessed with their potential business and how to get it. IBM aggressively spoke about "capturing the hearts, minds, and most importantly, wallets of the millennial generation …." And, who did IBM see as the key to unlocking these "billions" in sales?

> Your *millennial employees* are your most valuable and accessible asset when it comes to successfully marketing your business to the millennial generation.

The strategy was simple: hire a millennial workforce to appeal to millennial consumers.

8. Yet, while IBM increasingly focused on appealing to younger workers in pursuit of younger consumers, it trampled the civil rights of its current workforce over the age of forty. Mr. Capps – born in 1967 – is one of those

workers. IBM terminated Mr. Capps because of his age. Although he was the most successful salesperson in his group, he was not the "millennial employee" that IBM considered the "most valuable and accessible asset when it comes to successfully marketing your business to the millennial generation." Consequently, IBM terminated Mr. Capps's employment based on his age, but under the cover of a pretext.

9. Mr. Capps sells enterprise software with a very long lead time - eighteen to sixty months. Incentive Compensation Management/Sales Performance Management (ICM/SPM) is a little-known solution; few organizations seek out ICM. The majority of an ICM salesperson's time, therefore, is spent developing business, including, but not limited to, building relationships across various departments within an enterprise; educating sales prospects about the product; learning a prospect's business to understand its needs; forming the business value (business case and ROI); establishing the evaluation and purchasing process, budget, and resources. All of this highly specific, time consuming work must occur before a purchasing cycle that usually includes an RFP, security evaluations, pricing negotiations, implementation and services scopes of work, legal negotiations, and contracting. In addition, ICM is a very complex enterprise software requiring many integrations into client's systems (HR, ERP, CRM, Payroll,

Sales, Finance, Business Intelligence, Analytics/Reporting, Territory Management, Hierarchy management, Custom or inhouse built systems, etc.) and processes. Because the ICM solution spans across many of an business's different areas, departments and managers, the salesperson must sell to and earn buy-in from lots of parties across the whole organization (e.g., IT, HR, Payroll, Sales, Sales Operations, Compliance, Finance, Senior Leadership from each area/department, etc). This is why ICM takes eighteen to sixty months to close.

10. And, Mr. Capps was very successful closing this business. His sales numbers prove it. In the first half of 2016, his business quota was $466,647.00, but he closed $2,2350,000, which is 503.6% of his quota. Similarly, in the second half of 2016, his business quota was $300,000.00, but he closed $864,674.00, which is 288% of quota. He expected his remarkable success to continue.

11. But, in 2017, IBM forced a massive change on its salesforce. Instead of geographic territories, it moved to align sellers by vertical markets (e.g., Insurance, Banking Telcom, Life Sciences, etc.). Although this realignment affected many IBM ICM salespeople, it severely impacted Mr. Capps's sales because he had been in this group longer than all his affected peers, and, consequently, he was farther into the eighteen to sixty month sales cycle

on more deals. IBM's change forced him to relinquish more than ten in-process deals to other IBM employees. Essentially, he was starting over on deals with eighteen to sixty month lead times.

12. Despite this IBM-imposed setback, Mr. Capps began diligently rebuilding his deal pipeline. His sales numbers were predictably and understandably lower in 2017 and 2018 because of the long lead time on new deals. By 2019, however, Mr. Capps was again closing deals at a significant rate – he was 684% over quota in the first half of 2019, and his second half looked very promising as he was on the brink of closing a number of very large deals that – under his compensation plan – would have earned him over $1,000,000 in commissions. But, IBM intervened.

13. On June 14, 2019, Mr. Capps's direct supervisor called Mr. Capps for a phone meeting. To his shock, Mr. Capps's supervisor told him that IBM was terminating his employment as part of a Reduction in Force. When pressed for specifics, Mr. Capps was told that he was selected for poor sales performance. But, this was a pretext for age discrimination, because Mr. Capps was an incredible 684% above quota, significantly outperforming all of his peers over the last nine months at the time they claimed he was performing poorly. Further, he was on a similar trajectory for the year's second half.

14. When he pointed this out, IBM changed its reason and provided a new one – it was investing in other parts of its business and shifting resources there. This is also a pretext because Mr. Capps worked in sales for the very areas IBM was supposedly shifting resources into. In fact, IBM was not investing in other areas, it was – instead – investing in a younger workforce while terminating its older workers under various pretexts.

15. Finally, IBM changed its reasoning yet again. This time it provided some sort of wholly subject matrix for comparing Mr. Capps to three unknown employees in his group. At this time, IBM had already offered two previous pretexts; the faux matrix was merely its effort to re-engineer a plausible – but wholly untrue – non-discriminatory reason for terminating him.

16. As a result of IBM's discrimination against him, Mr. Capps lost over $1,000,000 in commissions and was forced to start over again.

## V.

## Age Discrimination in Employment Act Claim

17. Mr. Capps repeats and re-alleges the allegations contained Paragraphs 6 to 16 as if fully stated here.

18. Mr. Capps has satisfied all jurisdictional prerequisites in connection with his ADEA claim.

19. IBM's actions constitute intentional age discrimination in violation of the ADEA. Specifically, IBM abruptly terminated Mr. Capps as part of a focused effort to prune older workers from its workforce – in violation of their civil rights - and appeal to younger consumers. IBM terminated Mr. Capps because of his age.

20. As a result of IBM's actions, Mr. Capps has suffered and will continue to suffer pecuniary losses, including but not limited to lost wages and benefits associated with his employment. Mr. Capps will also incur legal fees for pursuing this action against IBM.

21. IBM's actions were willful. Thus, Mr. Capps is entitled to liquidated damages under the ADEA.

22. Mr. Capps seeks attorney's fees, expert witness fees, and other costs of suit.

## VI.

## Age Discrimination Under the Texas Labor Code

23. Mr. Capps repeats and re-alleges the allegations contained Paragraphs 6 to 16 as if fully stated here.

24. Mr. Capps has satisfied all jurisdictional prerequisites in connection with his Texas Labor Code claim.

25. IBM's actions constitute intentional age discrimination in violation of Texas Labor Code Chapter 21.  Specifically, IBM terminated Mr. Capps because of his age.

26. As a result of IBM's actions, Mr. Capps has suffered and will continue to suffer pecuniary losses, including but not limited to, lost wages and benefits associated with his employment.

27. Additionally, Mr. Capps has suffered and expects to suffer non-pecuniary losses, including, but not limited to, humiliation, damage to personal and professional reputation, undue stress, anxiety, and other non-pecuniary losses.

28. IBM has acted and continues to act with malice and reckless indifference to Mr. Capps's state-protected rights, and, thus, he is entitled to punitive damages under the Texas Labor Code.

29. IBM's actions were willful.  Thus, Mr. Capps is entitled to liquidated damages.

30. Mr. Capps seeks attorney's fees and costs of suit.

## VII.

## Request for Jury Trial

31. Mr. Capps respectfully requests that this matter be tried before a jury.

# VIII.

# Prayer for Relief

32. Mr. Capps respectfully requests that he have a judgment against IBM awarding him the following damages:

   a. Back pay, including but not limited to, lost wages and employment benefits;

   b. Equitable relief necessary to place Mr. Capps in the position he would have held but for IBM's discriminatory treatment, and if this is not feasible, then front pay;

   c. Actual damages;

   d. Liquidated damages in the maximum amount allowed by law;

   e. Compensatory and punitive damages in the maximum amount allowed by law;

   f. Prejudgment and post-judgment interest;

   g. Attorney's fees, expert witness fees, and costs of suit; and

   h. Any further legal and equitable relief he is entitled to.

Respectfully submitted,

/s/ Justin L. Jeter
_____

Justin L. Jeter
State Bar No. 24012910
JETER MELDER, llp
1111 S. Akard Street, Suite 100
Dallas, Texas 75215
Telephone: 214.699.4758
Facsimile: 214.593.3663
Email: justin@jetermelder.com

**ATTORNEY FOR PLAINTIFF**